Plaintiff was injured as a result of a collision between his motorcycle which he was operating and upon which he was carrying a passenger behind him, namely, his brother-in-law, William Warren, and a Chevrolet automobile belonging to the defendant, P. Rex Primeaux, which was being driven at the time by his minor daughter, Rexine Primeaux, and who at the time had as her guest in the front seat of the automobile with her Yvonne Broussard, also a minor, at the intersection of Charity Street with Louisiana Street in the City of Abbeville at about 3:00 o'clock in the afternoon on March 23, 1941. The plaintiff has also *Page 755 
joined in this suit the American Mutual Liability Insurance Company as the insurer of the automobile of P. Rex Primeaux. It was alleged and admitted that at the time of the accident defendant's minor daughter, Rexine Primeaux, was operating the Chevrolet automobile with the consent, authority and permission of her father, P. Rex Primeaux, one of the defendants herein, and that the minor daughter resided and lived with her father and mother.
Plaintiff alleges that the driver of the Chevrolet automobile was negligent in the following respects:
(1) That in executing a left turn from Charity Street, which is a State Highway (No. 25) into Louisiana Street she did so without extending her hand or arm, without giving any sort of warning signal whatsoever, without applying her brakes, thereby failing to apply or use her warning brake lights;
(2) That she made the left hand turn on a heavily trafficked and travelled highway and city street diagonally across same and at a point well before entering the intersection;
(3) That she failed to look to the rear.
Plaintiff further alleged that as a result of the collision his right leg was broken in several places and as a result he has itemized his damages, medical, surgical and hospitalization costs and expenses, mental and physical anguish, pain and suffering, and injuries to his leg, loss of earnings and property damage to the motorcycle in the full sum of $24,917.00, and, accordingly, prays for judgment in that amount against the defendants, together with legal interest thereon from date of judicial demand until paid.
Defendants filed a general denial and in addition charged the plaintiff with travelling at an excessive rate of speed of from 50 to 55 miles per hour and, therefore, that plaintiff did not have his motorcycle under proper control, which said negligence was the proximate cause of the accident. The defendants further plead in the alternative contributory negligence on the part of the plaintiff for the same reason. Defendants, however, after the trial contended that the negligence of the plaintiff in passing the defendant's automobile in an intersection was a proximate cause of the accident.
After many delays which were apparently secured or caused by the defendants, on November 26, 1945 the case was finally tried and on January 12, 1948 judgment was rendered in favor of the plaintiff and against both defendants in the sum of $6,033.40 which the Court itemized as follows: $533.40 as medical expenses; $1,500.00 for pain and suffering to plaintiff; $4,000.00 for injuries to his leg and loss of earnings
Counsel for defendants applied on January 14, 1948 for and were granted a rule directed to the plaintiff to show cause why a new trial and rehearing should not be granted. Also on the same date, in support of his motion for a new trial, counsel for defendants filed an affidavit in which he set forth that since the trial of the case he had discovered new evidence which he could not with due diligence have obtained before the trial. The judge of the District Court on February 14, 1948 overruled the motion for new trial and rehearing, whereupon judgment was read and signed on the first day of March, 1948. The same motion is being urged on appeal, however, we are of the opinion that the refusal of the District Court was correct as defendant had practically five years to obtain its evidence, and such alleged evidence as shown would not affect our findings and judgment.
The defendants have appealed from this judgment and the plaintiff has answered the appeal asking that the judgment be increased to at least the sum of $18,533.40.
The facts reveal that at about 3:00 o'clock P.M. on March 23, 1941, Miss Rexine Primeaux, daughter of the defendant P. Rex Primeaux, was driving her father's Chevrolet car in an easterly direction along Charity Street in the town of Abbeville, Louisiana. This street is a State Highway and is heavily used. At the west end of this street is located the Court House in the Town of Abbeville. In order to reach Charity Street at the western end thereof which begins in front of the Court House, it is necessary to either come from the left or right down Charles Street which is the street running north and south in front of the Court House and crossing *Page 756 
Charity Street at its beginning. In the car with Miss Primeaux on this afternoon was a friend, Yvonne Broussard, who at the time was 15 years of age. Miss Primeaux in her testimony admits that the lane of traffic ahead of her prior to the accident was clear and that she did not put out her hand to signify a left turn nor apply her brakes prior to making the left turn into Louisiana Street which crosses Charity Street one block east of its beginning, and gives as her reason for not doing so that just before she turned, she looked in her rear view mirror and saw the motorcycle turning at the Court House corner, which would be turning into Charity Street, and "so naturally I thought I had enough time to make it across." She further testified that she did not hear the motorcycle's horn blown.
The record further shows and there are pictures introduced that there was a filling station on the north and on the south corners of the intersection of Charles and Charity Streets. In front of the filling stations were three men who had a clear view down the street and saw the accident. One of these was dead at the time of the trial, however, the other two were witnesses in the case. These two living witnesses were Raoul Jones, Jr., who was employed in the Cities Service Filling Station, and Ron P. Trahan who operated the Conoco Filling Station across the street from the Cities Service Station. The testimony of these two eye witnesses as to material facts is practically the same. They testified that they were in front of the respective service stations about 2:30 or 3:00 o'clock on Sunday afternoon on the day of the accident, and that they saw the defendant Primeaux's car being driven by Miss Rexine Primeaux in an easterly direction on Charity Street, and also saw the motorcycle being operated by the plaintiff at approximately 15 to 25 miles per hour and in a careful manner, with someone riding with the plaintiff, go around the Court House square and turn into Charity Street behind the Primeaux automobile; that the Primeaux automobile was being driven approximately 12 to 15 miles per hour; that they heard the plaintiff blow his horn on the motorcycle in order to pass the Primeaux car, and immediately after the horn blew they saw the Primeaux car driven slightly to the right and then suddenly, without warning, to its left across Charity Street. They stated that Miss Primeaux turned without warning when the plaintiff was attempting to pass. The witness Jones testified that the plaintiff applied his brakes on the motorcycle but he did not know how far it skidded on the pavement before it struck the car. Both testified that there was a hole and a telephone post on the corner of Louisiana and Charity Streets and, according to the maps drawn by some of the witnesses in the case, this hole, ditch, or culvert and telephone post is located on the northwest corner of the intersection of Louisiana and Charity Streets. The accident occurred eight to ten feet from this telephone post and hole and, after Miss Primeaux cut in to make the left hand turn, the only place left for the plaintiff to drive his motorcycle was in the ditch or into this telephone pole. Plaintiff's brother-in-law, William Warren, who was riding on the back of the motorcycle was thrown over the top of the defendant's car when the motorcycle struck it. Witness Jones identified a picture of the defendant's car showing that it was struck on the extreme left end of the rear bumper and left rear fender. These eye witnesses further testified that the Primeaux car was approximately eight to ten yards from the corner of Louisiana and Charity Streets when she started to cut it to turn to the left, and that she did not go up to the corner and make a square turn. In fact, they testified that she made a diagonal turn.
Sidney Landry, operator of the Cities Service Filling Station, testified that he was not in a position to see the accident but that he did see the plaintiff on his motorcycle when he turned into Charity Street, and that the motorcycle was travelling approximately 15 miles per hour. He testified that he went to the scene of the accident immediately after it happened and we have in the record a drawing marked "Sidney Landry". This shows the point of the accident to be on the left hand side of Charity Street and closer to the northwest corner of the intersection of Louisiana and Charity Streets than to the center line *Page 757 
of Charity Street. The point of contact was very close to the culvert and telephone pole mentioned throughout the testimony. He located this point by reason of the fact that he found "a little dry dirt and things like that. As a rule when you hit something on the road it will fall there." According to Landry's testimony and the map which he has drawn, Miss Primeaux started to make a diagonal left hand turn before reaching the intersection.
The witness William Warren testified that he was a brother-in-law of the plaintiff and was riding behind him on the motorcycle on the afternoon of the accident, and when they first went into Charity Street the motorcycle was travelling at approximately 20 miles per hour; that he saw the Primeaux car in front of him being driven by a young lady and that it was going about 10 or 15 miles an hour; that as they overtook the car the plaintiff swerved to the left to look for any oncoming traffic and only seeing the Primeaux car on the road in front of him blew the horn two or three times, and it was then that the Primeaux car swerved over to the right as if to clear the road for them to go by. When this happened, the plaintiff proceeded to attempt to pass the Primeaux car, whereupon the Primeaux car pulled to the left and followed a diagonal course in order to make a left turn into Louisiana Street, and it was then that the plaintiff applied his brakes. He testified that the culvert and telephone post prevented the plaintiff from going any farther to his left in order to avoid the automobile. This witness stated that at the time the Primeaux car began to diagonally turn to its left that the motorcycle was at least even with the rear wheel of the Chevrolet car or "perhaps just a little past," but that as it was going faster than the car, even though the brakes were applied the motorcycle did not slow down enough to get behind the car and was finally jammed near the culvert and telephone pole at the northwest corner of the intersection of Louisiana and Charity Streets and at this point struck the car on the left rear fender and left end of the rear bumper.
The testimony of Frank Swinney, plaintiff, as to how the accident occurred is in accord with the material facts as given by all other eye witnesses who testified in his behalf.
The defendants offered an ordinance of the Town of Abbeville in evidence which ordinance fixed the speed limit at 25 miles per hour. The defendant P. Rex Primeaux testified that two hours after the accident he stepped off some skid marks on the pavement at the scene of the accident, that it was a single track of skid marks and that it was 20 paces or 60 feet in length. He did not see any other skid mark on the pavement other than this single mark but would not testify that it was made by the motorcycle, but from his testimony one would presume that the motorcycle was responsible for the skid mark.
Mr. J. Otto Broussard, Sr., an attorney-at-law who practiced in Abbeville for more than twenty years prior to the date of the accident, testified that he was walking along the east side of South Louisiana Street toward Charity Street with one of his grandchildren, and that he saw the motorcycle travelling east on Charity Street; that it was travelling pretty fast, he judged "something over 30 miles an hour," but that he did not see the collision when it happened as he was talking to his grandchild, and after seeing the motorcycle he looked down at the child while talking to it and it was then he heard the impact. He looked up and saw Warren being thrown over the top of the car. According to this witness' testimony, he fixed the point of impact at or near the northwest corner of the intersection of Louisiana and Charity Streets, for he testified that he was walking along the east side of South Louisiana Street and that the corner on which the accident occurred was "catacornered" from where he was walking, which clearly means diagonally. Therefore, his testimony in this respect is the same as that of plaintiff and his witnesses, and if this accident occurred near the northwest corner of the intersection of Louisiana and Charity Streets, Miss Primeaux is bound to have made a diagonal left hand turn and to have begun to turn to the left prior to reaching the intersection of the two streets. Mr. Broussard testified that the skid marks *Page 758 
made by the motorcycle were approximately 40 feet in length to the best of his recollection, although opposed to this is testimony to the effect that the motorcycle skidded only about 12 feet.
Before closing, counsel for the defendants stated that he wished to take the testimony of a Mr. Lindstrom whom he intended to use as an expert witness with regard to motorcycles. It was agreed that the testimony would be taken in or out of open court not later than December 8, 1945. This witness was never produced and his testimony never taken.
Defendants introduced the statement of Miss Yvonne Broussard who was in the Primeaux car on the day of the accident. Her testimony does not throw much light on the accident, however, she did state that the Primeaux car was being driven very slowly, under 15 miles per hour, and that Rexine Primeaux did not have to apply the brakes to attempt the turn from Charity into Louisiana Street. She also stated that just as Rexine Primeaux made or was making the left hand turn, she heard a noise like someone trying to put on brakes, which is corroborative of testimony of the plaintiff and other eye witnesses who testified that when the Primeaux car started to make its left hand turn it was then that the brakes were applied on the motorcycle.
Also offered by defendants was a statement of Melvin Martin who at the time was 15 years of age. In this statement he said that on the date of the accident he was standing by the Court House and saw two men on a motorcycle going around the Court House square; that they were going about 40 to 45 miles per hour; that when they would turn the corners the knee guard of the motorcycle would scrape the pavement. He saw them when they turned at LeBlanc's filling station on Charity Street and they turned the corner at 30 or 35 miles per hour, and after they had gotten straight they went faster, about 40 or 45 miles per hour. He stated that he could see the Primeaux car going down Charity Street at a slow rate of speed and "it looked like she was going to turn on Louisiana Street when the man on the motorcycle put on his brakes he was about 20 or 30 yards from the car." The trial court evidently did not give much weight to Martin's statement and neither do we in view of the other testimony to the contrary.
Counsel for defendants depend upon this statement plus the fact that William Warren was thrown over the top of the car when the motorcycle struck the back of the car, plus the testimony of the defendant Primeaux that there was a skid mark presumably made by the motorcycle 50 to 60 feet in length, and the testimony of Mr. Broussard that the motorcycle was going over 30 miles an hour just prior to the accident and that the skid mark made by the motorcycle was approximately 40 feet in length to establish the fact that the motorcycle was travelling at an excessive speed. There is no testimony in the record as to how far a motorcycle would skid at any given speed and, therefore, we have nothing upon which to base any definite conclusions from such a fact as to the speed of the motorcycle. However, it is established that the brakes were not applied until the Primeaux car started to make the left hand turn into Louisiana Street. If this be true, and the record establishes this fact, then it would have been useless for the plaintiff to put on his brakes 60 feet away as he could easily have continued on the right hand side of Charity Street, or, if he had crossed to the left side of Charity Street at this moment at a distance of 60 feet the car would have been out of the right lane of traffic and he would have had time to go to the rear of the car. This would seem true with regard to the 40 feet, however, we are of the opinion that the preponderance of the testimony is to the effect that the motorcycle was travelling from 20 to 25 miles per hour.
It is further argued by counsel for the defendants that the plaintiff was negligent in attempting to pass the Primeaux car at an intersection, in violation of the Highway Regulatory Act of 1938, Act No. 286 of 1938, Tit. 2, § 3, rule 7(e), Gen.St., Section 5212, Paragraph (e). The facts in this case show that at the time the plaintiff started to pass the Primeaux car it had not reached the intersection and also the plaintiff blew his horn and Miss Primeaux *Page 759 
pulled to her right, which gave the plaintiff the definite idea that she was pulling over for him to pass, and when she gave no hand signal nor brake light warning the plaintiff proceeded to attempt to pass her, which he had a lawful right to do, and it was at this moment that she pulled suddenly to the left and proceeded diagonally across Charity Street into Louisiana Street.
The Highway Regulatory Act of 1938, Act No. 286 of 1938, Tit. 2, § 3, rule 9 (a-c), Gen.St., Section 5214, Paragraphs (a), (b), and (c) are that:
"(a) The driver of any vehicle on the public roads, highways and bridges of this State shall ascertain, before turning around upon any such road, highway or bridge, that there is no traffic, vehicular or pedestrian, approaching from either direction which will be unduly or unnecessarily delayed and shall yield right-of-way to such approaching traffic and shall not attempt to make a turn unless and until the said way is clear.
"(b) Except as otherwise provided in this Section, the driver of a vehicle intending to turn to the right at an intersection shall approach such intersection in the lane for traffic nearest the righthand side of the highway, and in turning shall keep as closely as practicable to the right-hand curb or edge of the highway, and when intending to turn to the left shall approach such intersection in the lane for traffic to the right of and nearest the center line of the highway and in turning shall pass beyond the center of the intersection, passing as closely as practicable to the right thereof before turning such vehicle to the left.
"(c) For the purpose of this Section, the center of the intersection shall mean the meeting point of the medial lines of the highways intersecting one another."
In the case of Vernon v. Gillham et al., La. App., 179 So. 476, 480, this Court made the following observation: "The law leaves no uncertainty in prescribing the degree of care to be exercised by a driver of a motor vehicle when executing a left turn, especially in an intersection. Such a movement has been uniformly declared by the courts to be, and in fact, is about the most hazardous one of which a motor vehicle is capable of performing. It should not be undertaken except under most favorable conditions, and these conditions may only be known to the operator by a proper exercise of the senses of sight and hearing. * * *"
The doctrine has been affirmed and reaffirmed so many times it is useless to cite any further authorities. Miss Rexine Primeaux was guilty of violating the Highway Regulatory Act as above quoted and the settled jurisprudence is to the effect that she is liable under the facts in this case. Her negligence in failing to give the proper hand signal or brake warning signal, in making a left hand turn before she even reached the intersection and in a diagonal course rather than as the law directs, and her failure to keep a proper lookout for oncoming traffic was the proximate cause of the accident.
We find no negligence on the part of the plaintiff under the facts. There was no traffic coming and no traffic on Louisiana Street and he blew his horn before attempting to pass and the driver of the defendant's car pulled to the right which gave him every reason to believe that she heard his horn signal. He was not attempting to pass in the intersection but before they got to the intersection, and he was not going at any excessive rate of speed and the moment he discovered that Miss Rexine Primeaux intended to make a diagonal left hand turn he put on his brakes and steered his motorcycle to the left as far as possible in order to avoid the collision. In so far as the plaintiff is concerned, he did all in his power and all that he should have done to avert the accident at the moment he discovered that Miss Primeaux intended to make the illegal left hand turn.
When the plaintiff struck the automobile of the defendant, it bent the right leg guard on the motorcycle back in such a manner as to pin plaintiff's right leg and when he was thrown from the motorcycle by the force of the impact he testified it nearly pulled his leg off. Be that as it may, the record shows that he sustained a compound fracture of both bones of the *Page 760 
right leg about the middle third. The bones protruded. Plaintiff was taken to the Abbeville Clinic and he remained in the hospital five days. Dr. Marion A. Young of Abbeville, Louisiana treated the plaintiff, and his findings and report have been placed in the record and are as follows:
"On March 23, 1941 Mr. Sweeney sustained a compound fracture of both bones of the right leg about the middle third. There was considerable over-riding of the fragments. We attempted to reduce this with adhesive traction but were never able to bring the fragments into apposition. The traction was continued. At this time I put a steel pin through the heel bone to obtain positive traction. We were still even with this method, unable to bring the fragments into apposition. We then decided to do an open reduction. I operated on him April 16, 1941 at which time I found the Tibia with the lower fragment over-riding posteriorly and with considerable interposition of soft parts, which accounted for our inability to obtain complete reduction by the other methods. I put a steel plate in to hold the fragments in place. This was screwed firmly in place and an excellent reduction was obtained. The leg was then put in a plaster cast.
"The delay in this operation was because the original wound at the site of fracture was infected and draining and it was deemed wise to wait until this infection subsided. Of course, during this time Mr. Sweeney suffered considerable pain as would be expected from a case of this sort. X-rays taken after insertion of the plate and cast showed a perfect apposition and alignment. Mr. Sweeney probably became a little too active too soon before his leg was removed from the cast and loosened the steel plate. This caused a slight angulation of the fracture and considerable inflammatory reaction around the site of the fracture as indicated at present by a great deal of thickening over the Tibia in the region. I X-rayed Mr. Sweeney on February 26, 1942. This picture shows in the A.P. view the fracture is in alignment and the steel plate in place. The lateral view shows a slight anterior bowing of the Tibia at the site of the fracture. This is considerable thickening around the site of the fracture (callous). It is a good firm connection but there is this slight deformity.
"Mr. Sweeney also complains bitterly of pain in the right knee. He undoubtedly has a very dry joint and a chronic arthritis as movement causes distinct popping and grating sounds. In my opinion this will undoubtedly be a permanent source of trouble. At present he gets about with a decided limp and complains of considerable pain up and down the leg but mostly about the knee. I would estimate that Mr. Sweeney has a disability of approximately 50 per cent in this leg due mostly to the condition of his knee which is undoubtedly the result of the long immobilization of the knee in this case."
There is no doubt that plaintiff suffered excruciating pain. In addition to that which is contained in the doctor's report he testified that on August 7, 1942 they operated on plaintiff's leg and removed the steel plate. Dr. Young testified that he treated the plaintiff from March 1941, the date of the accident, until September 1942, and that when he discharged the plaintiff the disability in his leg was the same as mentioned in his report and that plaintiff's leg would swell considerably upon use. Doctor Young, on the date of the trial, November 26, 1945, almost five years after the accident, examined plaintiff's leg and testified that it was in essentially the same condition as when he rendered the report on March 6, 1942; that he still had a chronic arthritis due to the long immobilization of the knee in the course of treating the fracture, and he further testified that the plaintiff probably had some pain on the date of the trial and could not estimate how long plaintiff would suffer pain.
Plaintiff, prior to the injury, owned several trucks with which he hauled oil supplies. He operated one of the trucks himself, and the record shows that he only knew that kind of work; that he suffered financial losses after his injury due to the fact that he could not personally attend to his business but that on account of the war business picked up, however, he was *Page 761 
unable even at the date of the trial to perform the labor that he was doing prior to the injury. He testified that as a result of his working prior to the injury he made additionally from $250.00 to $300.00 per month; that after the injury he could not work and naturally lost this much. From the testimony, the plaintiff could never return to rough-neck oil work nor to operating his truck for it was necessary to also help load and unload heavy machinery and pipes and other material used in the oil industry.
We feel that the judgment of the District Court should be amended by increasing the award to the plaintiff for pain and suffering from $1,500.00 to $2,000.00; for physical injuries and loss of earnings from $4,000.00 to $6,500.00. The medical expenses of $533.40 are correct, making a total judgment of $9,033.40.
It is accordingly ordered that there be judgment in favor of the plaintiff Frank J. Swinney and against the defendants, P. Rex Primeaux and the American Mutual Liability Insurance Company, insolido, in the full sum of $9,033.40 with legal interest from judicial demand until paid and all costs. As thus amended, the judgment of the District Court is affirmed.